UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ARTHUR MCKINNON,

                    Plaintiff,

        v.

TAMMY NIKULA, *et al.*,

                    Defendants.

CASE NO. 3:20-CV-5367-BHS-DWC

REPORT AND RECOMMENDATION

Noting Date: **December 3, 2021**

Plaintiff filed this case under 42 U.S.C. § 1983. Dkt. 5. Before the Court is Defendants' motion for summary judgment. Dkt. 57. As discussed below, this motion should be granted.

**I.    Background**

Plaintiff is a convicted state prisoner incarcerated at Stafford Creek Corrections Center ("SCCC"). Dkt. 5 at 3. Plaintiff has sued several SCCC employees: (1) Tammy Nikula; (2) T. Harder; (3) J. Nagala; (4) D. Gordon; (5) R. Herrington; (6) K. Sutera; (7) S. Bangs; (8) Dennis Dahne; (9) Henry; (10) Ms. Rehak; (11) Mr. Schreiber; (12) K. Parris; (13) Tim Taylor; and (14) Gary Bohon. *See id.* at 3–5. Plaintiff has sued other employees of the Washington Department of

1    Corrections ("DOC"): (1) Carol Smith; (2) Stephen Sinclar; and (3) Risa Klemme. *Id.* at 5.

2    Plaintiff sues Defendants in their individual and official capacities. *Id.* at 7.

3        The thrust of the amended complaint is that various Defendants provided inadequate

4    medical care by failing to: (1) provide Plaintiff with steroid injections for lower back and hip

5    pain; (2) timely respond to his requests for medical care; and (3) provide him with certain

6    medical items for his lower back, hip, and knee pain. *See id.* at 7–11. Further, Plaintiff alleges

7    that certain Defendants retaliated against him by giving him a negative behavior observation,

8    firing him his job, and refusing to process his grievance about medical care because he

9    complained about inadequate medical care. *See id.* at 7–11, 14, 16. Plaintiff also alleges a

10   violation of the Americans With Disabilities Act ("ADA") based on similar allegations. *See id.* at

11   7, 11. Likewise, Plaintiff alleges that certain Defendants violated due process by denying his

12   grievances and/or failing to process them properly. *See id.* at 10–11. Moreover, Plaintiff alleges a

13   violation of the Ninth Amendment that he bases on "all other constitutional violations in this

14   civil litigation." *See id.* at 14. Lastly, Plaintiff alleges several state law violations. *See id.* at 7–11.

15   For relief, Plaintiff seeks damages, declaratory relief, and injunctive relief requiring Defendants

16   to provide adequate medical care (including "low back/SI joint shots") and certain medical items.

17   *See id.* at 17.

18       Defendants answered. Dkt. 40. After discovery, Defendants filed a motion for summary

19   judgment. Dkt. 57. Defendants filed a supplement to their motion for summary judgment that

20   concerns issues irrelevant here. Dkt. 66. Plaintiff filed a response to Defendants' motion for

21   summary judgment. Dkt. 69. Defendants replied. Dkt. 70.

22       The Court allowed Plaintiff to file a supplemental response to Defendants' motion for

23   summary judgment. Dkt. 71. The Court did so in light of its earlier statement that, "when ruling

24

on the motion for summary judgment, the Court would consider Plaintiff's amended complaint as evidence because he signed it under penalty of perjury." *Id.* at 2 (citation omitted). However, as the Court noted, Plaintiff did not sign the amended complaint under penalty of perjury, which precluded the Court from considering its allegations "as evidence when ruling on Defendants' motion for summary judgment." *Id.* (citations omitted). Plaintiff did not file a supplemental response.

## II.    Summary Judgment Standard

Summary judgment is only proper where the materials in the record show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), (c). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citation omitted). A disputed material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

When reviewing a motion for summary judgment, the court must believe the nonmoving party's evidence and draw all reasonable inferences in his or her favor. *T.W. Elec. Serv.*, 809 F.2d at 630–31. Also, the court must avoid weighing conflicting evidence or making credibility determinations. *Id.* at 631.

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)

1    (citation omitted). "Likewise, mere . . . speculation do[es] not create a factual dispute for

2    purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir.

3    1996) (citation omitted). Moreover, "[a] mere scintilla of evidence supporting the non-moving

4    party's position is insufficient[ to survive summary judgment]." *Rivera v. Philip Morris, Inc.*,

5    395 F.3d 1142, 1146 (9th Cir. 2005) (citation omitted).

6    **III.    Summary Judgment Evidence**

7          On April 11, 2018, before Plaintiff was in DOC custody, he received an X-ray of his right

8    hip. Dkt. 59-1 at 32. According to the radiologist, Dr. Hawkins, the X-rayed showed a "normal

9    right hip." *Id.* On the same date, Plaintiff received an X-ray of his lumbar spine that Dr. Hawkins

10   stated showed "minimal degenerative disk disease." *Id.* at 31. On May 9, 2018, Plaintiff received

11   "SNO X-Rays" that, according to Dr. Connelly, showed no abnormalities. *See id.* at 14, 19.

12   Based on Plaintiff's history of "chronic right-sided back, hip and knee pain," *id.* at 14, Dr.

13   Connelly referred him to Dr. Lu, who ordered an MRI, *id.* at 12.

14         On May 31, 2018, Plaintiff received MRIs of his lower back and right knee. *Id.* at 21, 29.

15   According to Dr. Cline, the MRI of his lower back showed "[m]inimal early degenerative

16   changes noting disc bulges at L2-3 and L3-4." *Id.* at 29–30. According to Dr. Desai, the MRI of

17   his right knee showed: (1) "[p]atellar tendinitis with small partial thickness tears of the patellar

18   tendon"; and (2) "[p]artial thickness ACL tear." *Id.* at 21–22. Dr. Connelly reviewed Dr. Desai's

19   findings and concluded Plaintiff had: (1) "[p]atellar tendinitis of right knee"; and (2) "[s]prain of

20   anterior cruciate ligament of right knee." *Id.* at 10. Dr. Connelly further stated that: the ACL was

21   "intact" despite showing "some partial tearing." *Id.*

22         On June 27, 2018, Dr. Yung gave Plaintiff a L3/L4 interlaminar epidural steroid

23   injection. *Id.* at 17. Plaintiff reported moderate to severe pain levels immediately following the

24

1  injection, with pain levels subsiding somewhat from those elevated levels over the next few days.

2  *See id.* at 7, 20. On July 12, 2018, Plaintiff told Dr. Lu that his pain level was "about back to"

3  where it was "[b]efore the injection." *Id.* at 7.

4        On August 17, 2018, Plaintiff saw Dr. Connelly regarding his complaints of right knee

5  pain. *Id.* at 4. Dr. Connelly referred him to Dr. Hanesworth, a knee reconstruction specialist,

6  regarding treatment options for his partial ACL tear. *See id.* at 5.

7        On August 27, 2018, Dr. Hanesworth evaluated Plaintiff. *Id.* at 2. Dr. Hanesworth "did

8  not see any indication of ACL damage" or "indication for surgery." *Id.* at 3. They discussed

9  "injection options including cortisone and PRP injections." *Id.* at 5. Plaintiff "elect[ed] to

10  monitor his symptoms" and not to "proceed with injection therapy." *Id.*

11        On November 6, 2018, upon entering DOC custody, Plaintiff received an intake

12  screening. *Id.* at 36. Plaintiff reported that he did not have any "physical or functional"

13  limitations and his gait was described as "[n]ormal." *Id.* at 36–37.

14        On January 3, 2019, while he was in DOC custody, Dr. Rice gave Plaintiff a steroid

15  injection for his SI joint. *See* Dkt. 5 at 20. Regarding this procedure, nondefendant Light, a

16  Certified Physician Assistant who treated Plaintiff at SCCC, declares: "A blind approach at an SI

17  injection was apparently conducted at [Plaintiff's prior prison], but documentation of that is

18  sparse." Dkt. 59 ¶ 12. "There is no evidence that [Plaintiff] requires SI joint injections." *Id.* "His

19  X-rays in 2020 did not show SI joint arthritis, and this was not a diagnosis made by his

20  community orthopedists prior to incarceration." *Id.* Dr. Rice's treatment note simply states that

21  Plaintiff had "SI discomfort not residing" and "SI [joint] pain for a long time." Dkt. 59-1 at 40.

22        On January 14, 2019, upon his transfer to SCCC, Plaintiff received an intake screening.

23  *Id.* at 34. Plaintiff did not report any complaints about his back, hip, and or knee. *Id.* at 34–35.

24

On March 31, 2019, Plaintiff sent a Health Services Kite ("HSK") asking for pain medication for back, hip, and right knee pain. Dkt. 5 at 22. In the HSK, Plaintiff stated that he was already receiving naproxen and Tylenol for pain. *Id.* On April 1, 2019, Defendant Harder responded that Plaintiff had a scheduled follow-up with Defendant Bangs in June but that, if Plaintiff could not wait, he could "request to be seen at sick call." *Id.*

On April 2, 2019, Plaintiff signed up for sick call. *Id.* at 24. One day later, Defendant Nagala placed him on the schedule. *Id.*

On April 4, 2019, Defendant Nikula authorized Plaintiff for a job in the kitchen on the serving line from 11:00 a.m. to 7 p.m. Dkt. 5 at 26; Dkt. 60 ¶ 5. That evening, Plaintiff requested a job on the morning shift because he allegedly was "starting full time correspondence college and [could not] accomplish that on his [evening] shift." Dkt. 60-1 at 15.

On April 5, 2019, Defendant Gordon, a registered nurse, gave Plaintiff a temporary "[health status report] [] for limited standing" that expired on April 30, 2019. *Id.*; Dkt. 4 at 28. Plaintiff alleges that Defendant Gordon told him he would see his provider on April 15, 2019. Dkt. 5 at 9. However, while the evidence supports a finding that Defendant Gordon notified Plaintiff's provider, there is no evidence that Defendant Gordon told Plaintiff that his provider would see him on April 15, 2019. *See* Dkt. 59-1 at 41; Dkt. 4 at 28.

On April 5, 2019, Plaintiff dropped off the health status report ("HSR") for his kitchen job, whereupon it was suspended until April 30, 2019 and terminated shortly thereafter for "medical" reasons. Dkt. 60 ¶ 8; Dkt. 60-1 at 9–11. On the same date, nondefendant Conrad "stated it was odd that [Plaintiff] was willing to work in the kitchen as long as he got an a.m. job, but after he received the p.m. job, he went and got an HSR." Dkt. 60 ¶ 7. Further, Conrad stated that Plaintiff said he was willing to work, but wanted a job where he could move around. *Id.*

Conrad added that she told Plaintiff he could not "pick and choose where he worked" and would be reassigned to the kitchen when the HSR expired. *Id.*; Dkt. 60-1 at 5. Still on April 5, Defendant Nikula entered a negative Behavior Observation Entry ("BOE") reporting Conrad's observations. Dkt. 60-1 at 5.

On April 16, 2019, Plaintiff sent an HSK inquiring about Defendant Gordon's alleged guarantee that Plaintiff's provider would see him on April 15, 2019. Dkt. 4 at 30. On April 24, 2019, Defendant Nagala responded that an appointment was made and that Plaintiff would be seen in one to three months. *Id.*

On April 25, 2019, Plaintiff sent an HSK stating that he was: (1) in pain; (2) having trouble sitting, standing, or lying down; (3) limping; and (4) taking naproxen and Tylenol. Dkt. 5 at 32. Further, Plaintiff stated that he wanted Amitriptyline to help with sleep and another shot in the SI joint. *Id.* One day later, Defendant Herrington, a doctor, told Plaintiff he had a provider appointment coming up and extended his HSR. *Id.*

On May 16, 2019, Defendant Bangs, a Certified Physician Assistant, saw Plaintiff. Dkt. 59-1 at 43. In response to Plaintiff's complaints of worsening pain, Defendant Bangs ordered Amitriptyline and Etodolac along with an X-ray. *Id.* at 43–44. Plaintiff characterizes these drugs as "a sleep aid and an anti-inflammatory." Dkt. 5 at 9.

On May 20, 2019, Plaintiff received an X-ray of his right hip. Dkt. 59-1 at 44. According to the X-ray report, no abnormalities to account for Plaintiff's complaints of pain were found. *See id.*

On June 27, 2019, Plaintiff sent an HSK asking for a slip-on knee brace for "ongoing pain." Dkt. 5 at 34. On June 28, 2018, Defendant Harder responded that the knee brace was "not

considered medically necessary" and that Plaintiff could discuss other options at his 3-month follow-up. *Id.*

On July 4, 2019, Plaintiff asked for a sick call to address pain management. *Id.* at 36. On July 5, 2019, Defendant Sutera added him to the schedule. *Id.*

On July 8, 2019, nondefendant Wilson, a nurse, saw Plaintiff. Dkt. 59-1 at 45. Wilson told him that he could discuss these issues and "other chronic questions" with Defendant Bangs that week. *Id.*

On July 15, 2019, Defendant Bangs saw Plaintiff. *Id.* According to Defendant Bangs, Plaintiff stated that his pain had increased since the reduction in his yoga classes but that he was "otherwise doing well and taking meds. as prescribed." *See id.* Defendant Bangs ordered Plaintiff to continue his home exercise program and prescribed "2 ACE wraps" for his knees. *Id.* There is no evidence supporting Plaintiff's allegation that he asked for, but that Defendant Bangs denied, stronger pain medication. *See* Dkt. 5 at 9.

On October 31, 2019, Plaintiff's prescription for Amitriptyline and Etodolac were renewed. Dkt. 59-1 at 46.

On December 23, 2019, Plaintiff filed a grievance in which he complained about not receiving a lower back shot "for pain and mobility" and asked for removal of Defendant Nikula's April 5, 2019 BOE. Dkt. 5 at 55. The latest date Plaintiff referenced in his grievance was April 5, 2019. *Id.* On December 24, 2019, Defendant Dahne, a Grievance Coordinator, rejected the grievance on the basis that: (1) Plaintiff raised more than one issue in his grievance; (2) Plaintiff could only grieve issues that occurred within the past twenty days; and (3) BOEs are not grievable. *Id.*

1    On February 28, 2020, Plaintiff appealed. *Id.* at 56. On March 6, 2020, Defendant Dahne

2  did not accept the appeal. *Id.* Defendant Dahne further informed Plaintiff that he could not

3  appeal to the next level but that, if he disagreed with his decision, he could write to the

4  Grievance Program Manager ("GPM") and request a review. *Id.*

5    On March 9, 2020, Plaintiff wrote the GPM, Defendant Carol Smith, to request a review.

6  *Id.* at 57. On March 26, 2020, Defendant Smith responded. Dkt. 61-1 at 42. Defendant Smith

7  stated that: (1) grievance coordinators could not force a medical provider to administer

8  medications or change a medical diagnosis and to work with his medical provider for his desired

9  outcome; and (2) she was denying his grievance on this basis. *Id.*

10    Meanwhile, on January 31, 2020, Plaintiff sent an HSK stating that his lower back and

11  hip pain had become "significantly worse" and requesting "a shot in [his] right SI." Dkt. 5 at 59.

12  On February 7, 2020, an appointment was made for Plaintiff to see his provider within one

13  month. *Id.* That Parties have not identified who stated that an appointment would be made; that

14  person's signature is not clear. *See id.*

15    On February 28, 2020, Plaintiff sent an HSK again complaining about pain and

16  "requesting lower back shots" for "low mobility." *Id.* at 61. On March 5, 2020, Defendant

17  Harder responded that Plaintiff had "an appointment coming up to discuss this." *Id.*

18    On March 6, 2020, Plaintiff sent another HSK contending that Defendant Harder did not

19  schedule an appointment and requesting stronger pain medication. *Id.* at 63. On March 10, 2020,

20  Defendant Henry responded that (s)he would schedule Plaintiff for the next available sick call

21  with his provider so that he could discuss his concerns. *Id.*

22    On March 28, 2020, Plaintiff wrote Defendant Bohon, the Correctional Program

23  Manager, to challenge Defendant Nikula's April 5, 2019 BOE. *See id.* at 78. On April 14, 2020,

24

Bohon found that the BOE was "factual and objectively written" and, therefore, denied Plaintiff's request to remove it. *Id.*

On March 30, 2020, Plaintiff wrote Defendant Klemme, the ADA Coordinator, a letter complaining about pain, limited mobility, and a lack of lower back shots. *Id.* at 65. Further, Plaintiff stated that he had unsuccessfully attempted to request "reasonable accommodations to include a medical mattress, wedge pill[o]w, [and/or a] knee brace." *Id.* Plaintiff asked Defendant Klemme to provide him with lower back shots and his alleged reasonable accommodations. *Id.* There is no evidence Defendant Klemme responded to this letter.

On April 25, 2020, Plaintiff sent an HSK asking to be seen for his "pain issues." *Id.* at 82. Two days later, nondefendant Berkley told him he was scheduled to be seen "in the next couple of weeks." *Id.* On April 29, 2020, Plaintiff sent another HSK complaining that he had not been seen "for months" and stating that he needed "shots for SI joint pain, [a] knee brace, medical pillows/wedges, better pain meds, and [a] MRI/CAT scan." *Id.*

On May 6, 2020, nondefendant Light canceled Plaintiff's prescription for Etodolac and prescribed him acetaminophen for pain as needed. *See* Dkt. 59-1 at 48–49. On May 20, 2020, Light increased Plaintiff's dosage of Amitriptyline and prescribed diclofenac gel for osteoarthritis and lidocaine cream for pain as needed. *Id.* at 47. On July 14, 2020, Light renewed Plaintiff's prescription for Amitriptyline. *Id.* at 50.

On August 31, 2020, Light examined Plaintiff. *Id.* at 51. According to Light's report of this encounter, Plaintiff continued to complain about low back pain. *Id.* Also, Plaintiff stated that his yoga was "great physical therapy" but was "avoiding naproxen," apparently because it was causing him abdominal pain. *See id.* at 51–52. Light noted that Plaintiff was limping "favoring the right," had "pain over the area about L3-L4 on the right where there [was] a . . . rubbery

mass," and "pain over the area of the right SI joint." *Id.* at 51. Light stated that he would: (1) "query the DOC orthopedist" about Plaintiff's "[l]ow back pain and SI joint pain"; (2) "ask for an ultrasound" of the L3/L4 area; and (3) "ask for formal physical therapy." *Id.* at 52.

On September 2, 2020, Plaintiff received X-rays of his lumbar spine. *Id.* at 53. Nondefendant Dr. Wesolowski found "[n]o acute lumbar spine fracture of malalignment" and a "[l]eft-sided L5 pars defect." *Id.*

On September 5, 2020, Light consulted with Dr. Sawyer, the DOC orthopedist. *Id.* at 54–55. Dr. Sawyer considered the September 2 X-rays and Plaintiff's "radiology reports from the community." *Id.* Dr. Sawyer found that Plaintiff had "[l]ow back pain" and that, although Plaintiff had "facet DJD on the right at L5-S1," this defect was "mechanical in nature and best managed conservatively." *Id.* Further, Dr. Sawyer stated: "I would not expect any long term benefit from injections, nor does it sound like his symptoms are severe enough that any invasive treatment is medically necessary." *Id.* at 55.

Plaintiff submitted several declarations from other prisoners to support his amended complaint. Dkts. 6–11, 17, 46–53. These declarations are written at a high level of generality and repeat Plaintiff's allegation that he limped and struggled to walk, sit, and sleep owing to his chronic lower back, hip, and knee pain. *See id.*

## IV.   Discussion

### A.   Personal Involvement

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead [and prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983,

1  if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act

2  which he is legally required to do that causes the deprivation of which complaint is made."

3  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978) (citation omitted).

4        Here, there is no evidence that Defendants Rehak, Sinclair, Schreiber, Parris, and Taylor

5  had any personal involvement in the alleged § 1983 violations. Plaintiff seeks to make Defendant

6  Sinclair liable "for his supervisory position and . . . as he [allegedly] controls policy." Dkt. 5 at

7  17. Again, however, there is no evidence supporting this conclusory allegation, and vicarious

8  liability is inapplicable to § 1983 suits. Therefore, no reasonable juror could find in Plaintiff's

9  favor on any of his § 1983 claims against these Defendants.

10        B.    <u>Inadequate Medical Care</u>

11        **1.    Personal Involvement**

12        There is no evidence showing that Defendants Nikula and Bohon had any personal

13  involvement in Plaintiff's medical care, whether regarding scheduling or the provision of care.

14  So no reasonable juror could conclude that they provided him inadequate medical care.

15        **2.    Remaining Defendants**

16        To prevail on an Eighth Amendment claim predicated on the denial of medical care, a

17  plaintiff must show that: (1) he had a serious medical need; and (2) the defendant's response to

18  the need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see*

19  *also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). To establish a serious medical need, the

20  plaintiff must show that the "failure to treat [the] . . . condition could result in further significant

21  injury or the unnecessary and wanton infliction of pain." *Jett*, 439 F.3d at 1096 (citation

22  omitted). "The existence of an injury that a reasonable doctor or patient would find important

23  and worthy of comment or treatment; the presence of a medical condition that significantly

24

affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

Here, a reasonable juror could conclude that Plaintiff had chronic lower back, hip, and knee pain that constituted a serious medical need. The record supports a reasonable finding that these conditions caused Plaintiff serious pain over an extended period. Furthermore, Plaintiff received treatment for these conditions from medical professionals before and after he entered DOC custody. So the issue is whether Defendants were deliberately indifferent to these medical needs.

For a prison official's response to a serious medical need to be deliberately indifferent, the official must "'know[] of and disregard[] an excessive risk to inmate health.'" *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

It is well-established that "a mere difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference." *See, e.g.*, *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alterations in original) (citation omitted). This rule applies whether the difference is between the medical professional(s) and a prisoner or two or more medical professionals. *See, e.g.*, *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (citation omitted).

1    In appropriate cases, however, a prisoner may state a claim of deliberate indifference to

2    medical needs based on a difference of medical opinion. To do so, the prisoner must show that

3    "the course of treatment the doctors chose was medically unacceptable under the circumstances,"

4    and that they "chose this course in conscious disregard of an excessive risk to [the prisoner's]

5    health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citations omitted), *overruled on*

6    *other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc). Under this rule, for

7    instance, denying an inmate a kidney transplant based on "personal animosity" rather than

8    "honest medical judgment" would constitute deliberate indifference. *Id.*

9    Non-medical prison officials may be deliberately indifferent to medical needs by

10    "intentionally denying or delaying access to medical care or intentionally interfering with the

11    treatment once prescribed." *See Estelle*, 429 U.S. at 104–05. But an "inadvertent or negligent

12    failure to provide adequate medical care alone does not state a claim under § 1983." *Jett*, 439

13    F.3d at 1096 (alteration adopted) (citation and internal quotation marks omitted). Furthermore,

14    mere delays in a prisoner's medical treatment do not constitute deliberate indifference unless

15    they cause the prisoner further harm and the defendants know this to be the case. *See Hallett v.*

16    *Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (citation omitted).

17    Here, a reasonable juror could not conclude that the remaining Defendants were

18    deliberately indifferent to Plaintiff's medical needs. Regarding Defendant Harder, the evidence

19    shows that, in response to Plaintiff's March 31, 2019 HSK, Defendant Harder told Plaintiff that

20    Plaintiff had a follow-up with Defendant Bangs in June but could request a sick call. Dkt. 5 at

21    22. Defendant Gordon saw Plaintiff on April 5, 2019. *Id.* at 26. Further, the evidence shows that,

22    in response to Plaintiff's June 27, 2019 HSK requesting a knee brace, Defendant Harder stated

23    that a knee brace was "not considered medically necessary" but that Plaintiff could discuss other

24

1    options at his 3-month follow-up. *Id.* at 34. Additionally, the evidence shows that, regarding

2    Plaintiff's February 28, 2020 HSK requesting lower back shots, Defendant Harder responded

3    that Plaintiff had "an appointment coming up to discuss this." *Id.* at 61. Plaintiff next saw his

4    provider, nondefendant Light, on May 6, 2020. Dkt. 59-1 at 48–49.

5        This evidence does not support a reasonable finding that Defendant Harder was

6    deliberately indifferent to Plaintiff's medical needs. Defendant Gordon saw Plaintiff a few days

7    after Defendant Harder responded to his March 31, 2019 HSK. Furthermore, when Defendant

8    Harder told Plaintiff that a knee brace was not medically necessary, it is unclear whether

9    Defendant Harder was making the medical decision or informing Plaintiff of his provider's

10   medical decision. If the former, as noted, Plaintiff's mere disagreement with Defendant Harder's

11   medical judgment does not constitute deliberate indifference. If the latter, Plaintiff cannot show

12   that Defendant Harder was "responsible for" this decision, precluding a deliberate indifference

13   claim against her. *See McGuckin*, 974 F.2d at 1062. Notably, Plaintiff has not responded to

14   nondefendant Light's declaration that the DOC had a "specific" policy prohibiting authorization

15   of a knee brace in Plaintiff's case. Dkt. 59-1 ¶ 7.

16       The evidence also shows that, regarding Plaintiff's February 28, 2020 HSK requesting

17   lower back shots, Defendant Harder responded that Plaintiff had "an appointment coming up to

18   discuss this." Dkt. 5 at 61. Plaintiff next saw Light on May 6, 2020. Dkt. 59-1 at 48–49. It is

19   unclear from the record whether Defendant Harder was referring to this appointment. It is also

20   unclear whether Defendant Harder had the ability to schedule a faster appointment. It is clear,

21   however, that Plaintiff did not request increased pain medication in the February 28, 2020 HSK.

22   Furthermore, the objective medical evidence compels the conclusion that Plaintiff's conditions

23   were "chronic." Dkt. 59 ¶ 8; *see also supra* Part III. Therefore, the evidence does not support a

24

1  reasonable finding that Defendant Harder's alleged delay on February 28, 2020 in scheduling

2  Plaintiff to see his provider caused him further pain and that Defendant Harder knew that to be

3  the case. *See Hallett*, 296 F.3d at 746.

4      Moreover, the overall record shows that Plaintiff received considerable medical care for

5  his chronic conditions. While at SCCC, Plaintiff had several appointments with medical

6  providers and received painkillers and anti-inflammatories, two X-rays, knee wraps, and yoga

7  classes. *See Estelle*, 429 U.S. at 107 (rejecting medical deliberate indifference against medical

8  personnel who "diagnosed [the plaintiff's] injury as a lower back strain and treated it with bed

9  rest, muscle relaxants and pain relievers" but declined to take an X-ray). True, Plaintiff did not

10  receive any further steroidal injections in his lower back or SI joint. However, the evidence

11  impels the inference that Plaintiff's lower back injection was ineffective. *See* Dkt. 59-1 at 7, 17,

12  20. Furthermore, although Plaintiff reported positive results from his SI joint injection, no

13  objective medical evidence substantiates this assertion. *See, e.g.*, Dkt. 59 ¶ 12; Dkt. 59-1 at 55.

14  And, as noted, any difference of medical opinion between Dr. Rice, who administered the SI

15  joint injection, and Defendants' medical experts would not constitute deliberate indifference.

16      In short, the overall record indicates that SCCC staff provided Plaintiff adequate medical

17  care for his serious medical issues. Thus, Defendant Harder's alleged delay on February 28, 2020

18  in scheduling Plaintiff to see his provider would amount to no more than "an isolated occurrence

19  or an isolated exception to [Plaintiff's] overall treatment." *See McGuckin*, 974 F.2d at 1060

20  (citations and internal quotation marks omitted). So no reasonable juror could conclude that this

21  delay constituted deliberate indifference.

22      The evidence shows that Defendant Gordon gave Plaintiff an HSR for limited standing,

23  Dkt. 4 at 28, which does not suggest deliberate indifference. Furthermore, although Plaintiff

24

1    alleges that Defendant Gordon guaranteed that he would see his provider on April 15, 2019, no

2    evidence reasonably supports such a finding. *See id.*; Dkt. 59-1 at 41. And, even if Defendant

3    Gordon made this statement, no evidence supports a finding that he intentionally delayed

4    Plaintiff's medical care or knew this delay caused Plaintiff further pain, assuming it did. In short,

5    no reasonable juror could conclude that Defendant Gordon was deliberately indifferent to

6    Plaintiff's medical needs.

7         Nor could a reasonable juror conclude that Defendant Bangs disregarded Plaintiff's

8    medical needs. On May 16, 2016, in response to Plaintiff's complaints of worsening pain,

9    Defendant Bangs ordered Amitriptyline and Etodolac along with an X-ray. Dkt. 59-1 at 43–44. If

10   a defendant's decision "not to order an X-ray, or like measures, does not represent cruel and

11   unusual punishment," it is unreasonable to conclude that prescribing additional medications and

12   ordering an X-ray (which was negative) constitutes deliberate indifference. *See Estelle*, 429 U.S.

13   at 107. Furthermore, on July 15, 2019, Defendant Bangs prescribed Plaintiff 2 knee wraps. Dkt.

14   59-1 at 45. Plaintiff contends that Defendant Bangs should have prescribed him knee braces. But,

15   as noted, Plaintiff's mere disagreement with Defendant Bangs's medical judgment does not

16   constitute deliberate indifference.

17        Plaintiff sues Defendant Herrington, the SCCC medical director, for deliberate

18   indifference. But the evidence shows that, in response to Plaintiff's April 25, 2019 HSK,

19   Defendant Herrington extended Plaintiff's HSR and told him his provider appointment was

20   coming up. Dkt. 5 at 32. Then, on May 16, 2019, Defendant Bangs prescribed Plaintiff new

21   medication and an X-ray. Dkt. 59-1 at 43–44. Likewise, Defendant Herrington declares that "the

22   only direct involvement [he] had with [Plaintiff's] care . . . consisted of renewing some

23   prescriptions, ordering lab tests, responding to a kite[,] and discontinuing a medicine that had

24

been recalled." Dkt. 58 ¶ 5. Plaintiff does not challenge these representations in his response.
Dkt. 69. No reasonable juror could conclude that such treatment constituted deliberate
indifference.

Plaintiff faults Defendant Klemme, the ADA Coordinator, for not responding to his letter
complaining about pain and his failure to receive lower back shots and medical items (i.e., a
medical mattress, wedge pillow, and knee brace). Dkt. 5 at 65. Again, however, Plaintiff has not
responded to nondefendant Light's declaration the DOC had a "specific" policy prohibiting
authorization of these items in Plaintiff's case. Dkt. 59-1 ¶ 7. Minimally, Plaintiff has not shown
that Defendant Klemme was "responsible for" the decision to deny Plaintiff these items. *See*
*McGuckin*, 974 F.2d at 1062. And, to reiterate, Plaintiff's mere disagreement with the decision
not to prescribe these items does not constitute deliberate indifference.

Plaintiff's medical deliberate indifference claims against Defendants Nagala, Sutera, and
Henry present no triable issues of fact. In response to Plaintiff's HSKs, Defendants Nagala and
Sutera promptly scheduled him to see medical providers, which does not suggest deliberate
indifference. Dkt. 4 at 30; Dkt. 5 at 24, 36. For his/her part, in response to Plaintiff's March 6,
2020 HSK, Defendant Henry stated (s)he would schedule him for the next available sick call.
Dkt. 5 at 63. As discussed, Plaintiff did not see his provider until May 6, 2020. Dkt. 59-1 at 48–
49. Any allegation that this delay constitutes medical deliberate indifference creates no genuine
issue for trial for the same essential reasons that Plaintiff's claim against Defendant Harder does
not.

Plaintiff alleges that Defendant Smith, the Grievance Program Manager, denied his
request to review his grievance complaining about his medical issues. Dkt. 5 at 55, 57; Dkt. 61-1
at 42. However, Defendant Smith stated in her response that she could not "force a medical

provider to administer medications [or] change a medical diagnosis" and to "work with [his]

medical provider for [his] desired outcome." Dkt. 61-1 at 42. Defendant Smith's so states in her

declaration. Dkt. 61 ¶ 9. Plaintiff has not challenged the truth of this statement. So this claim

presents no genuine dispute of material fact.

In sum, a reasonable juror could only conclude that Defendants were not deliberately

indifferent to Plaintiff's medical needs. Defendants are entitled to judgment as a matter of law on

Plaintiff's Eighth Amendment medical deliberate indifference claim.

C.    Retaliation

Plaintiff alleges that Defendants Nikula, Bohon, Dahne, and Smith retaliated against him

by giving him a negative BOE, firing him from his job, and refusing to process his grievance

about medical care because he complained about inadequate medical care. *See* Dkt. 5 at 7–11,

14, 16.

"Within the prison context, a viable claim of First Amendment retaliation entails five basic

elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because

of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his

First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional

goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (citations omitted).

The First Amendment protects a prisoner's right "to file prison grievances," and to "pursue

civil rights litigation in the courts." *Id.* at 567 (citations and internal quotation marks omitted).

Adverse action has a chilling effect on the prisoner's First Amendment rights if the "official's acts

would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* at

568 (internal quotation marks and emphasis omitted). "A plaintiff who fails to allege a chilling

effect may still state a claim if he alleges he suffered some other harm that is more than minimal."

1  *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (alteration adopted) (citations and internal

2  quotation marks omitted).

3         Regarding causation, "the plaintiff must allege a causal connection between the adverse

4  action and the protected conduct." *Id.* "Direct evidence of retaliatory intent" or "a chronology of

5  events from which retaliation can be inferred" may demonstrate the requisite causal connection.

6  *See id.* (citations omitted).

7         Here, the Court assumes, without deciding, that Plaintiff's presentation of the HSR to

8  nondefendant Conrad constituted protected activity. Nevertheless, no reasonable juror could

9  conclude that the entry of the negative BOE constituted adverse action. The negative BOE simply

10 reported Conrad's observations and was "factual and objectively written." Dkt. 5 at 78; *see also*

11 Dkt. 57 at 9–10 (citing cases). Furthermore, even though Nikula designated the BOE as negative,

12 Plaintiff has not identified any harm that resulted from its entry. Any assertion that the negative

13 BOE caused Plaintiff to lose his kitchen job would fail. The evidence compels the conclusion

14 that Plaintiff's job was suspended, and later dropped, for medical reasons. Dkt. 60 ¶ 8; Dkt. 60-1 at

15 9–11.

16        Similarly, Plaintiff alleges that he was fired from his kitchen job because he presented the

17 HSR. However, Plaintiff presented the HSR because he did not want to work in the kitchen. Giving

18 Plaintiff the outcome he desired did not harm him and would not dissuade a reasonable person

19 from complaining about his conditions of confinement. And, as noted, Plaintiff was not "fired"

20 from his kitchen job. Rather, the evidence shows that it was suspended and then dropped for

21 medical reasons.

22        Further, Plaintiff alleges that Defendants Dahne and Smith failed to process his grievances

23 because he complained about inadequate medical care. But a reasonable juror could only conclude

24

1  that Defendants Dahne and Smith took these decisions because of DOC policy, not because of

2  Plaintiff's medical complaints.

3        On December 24, 2019, Defendant Dahne, the Grievance Coordinator, rejected Plaintiff's

4  grievance on the basis that: (1) Plaintiff raised more than one issue in his grievance; (2) Plaintiff

5  could only grieve issues that occurred within the past twenty days; and (3) BOEs are not

6  grievable. Dkt. 5 at 55. Review of the grievance supports these findings. *See id.* Defendant

7  Dahne then rejected Plaintiff's appeal for the same reasons but informed Plaintiff he could

8  appeal to Defendant Smith, the Grievance Program Manager. *Id.* at 56. Defendant Smith denied

9  Plaintiff's grievance on the ground that she could not force a medical provider to administer

10  medications or change a medical diagnosis. *Id.* at 57. Defendant Smith so declares in support of

11  Defendants' motion for summary judgment, and further declares that Defendant Dahne's

12  processing of Plaintiff's grievance conformed to DOC policy. *See* Dkt. 61 ¶¶ 4, 7, 9. Defendant

13  did not challenge her statements in his response. Dkt. 69. Accordingly, Plaintiff's claim that

14  Defendants Dahne and Smith rejected his grievance because he complained about his medical

15  conditions presents no genuine issue for trial.

16        In sum, no reasonable juror could conclude that Defendants Nikula, Bohon, Dahne, and

17  Smith retaliated against Plaintiff. Accordingly, these Defendants are entitled to judgment as a

18  matter of law on Plaintiff's retaliation claim.

19        D.    <u>ADA</u>

20        Plaintiff alleges that Defendant Nikula discriminated against him based on disability

21  when she issued the negative BOE. Dkt. 5 at 7. Plaintiff reasons that her conduct was

22  discriminatory because he "could not perform this particular job [but] was open to other work

23  positions." *See id.* Further, Plaintiff alleges that Defendant Bohon chose to "aid" her ADA

24

1  violation by denying Plaintiff's request to remove the negative BOE. *See id.* at 11. Also, Plaintiff

2  asserts an ADA claim against Defendant Klemme for not responding to his letter complaining

3  about his medical conditions and asking Defendant Klemme for lower back shots and medical

4  items. *See id.*

5      Plaintiff does not expressly allege under what Title(s) his ADA claim arises. Defendants

6  construe Plaintiff's ADA claim as a Title II disability discrimination claim. Dkt. 57 at 7–10.

7  Plaintiff did not challenge this construction or otherwise respond to Defendants' arguments about

8  his ADA claim. Dkt. 69. So the Court analyzes this as a Title II claim.

9      Plaintiff sues Defendants in their individual and official capacities. Dkt. 5 at 7. "To the

10  extent [P]laintiff is attempting to bring [this] claim[] against defendants in their individual

11  capacities, [P]laintiff fails to state a claim because individual liability is precluded under the

12  ADA." *Ziegler v. Corr. Indus.*, No. C20-5288-RJB-TLF, 2020 WL 10758519, at *5 (W.D.

13  Wash. July 15, 2020) (citations omitted). However, Title II "does not prohibit . . . injunctive

14  action[s] against state officials in their official capacities." *Miranda B. v. Kitzhaber*, 328 F.3d

15  1181, 1188 (9th Cir. 2003) (per curiam). The Court must treat such claims as "a suit against the

16  official's office." *Id.* at 1187 (citation and internal quotation marks omitted). Thus, Plaintiff's

17  official-capacity ADA claim is a claim against the DOC. *See id.*

18      "Title II of the ADA prohibits public entities from discriminating on the basis of

19  disability." *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021) (citing 42

20  U.S.C. § 12132). "To state a prima facie case for a violation of Title II, a plaintiff must show: (1)

21  he is a qualified individual with a disability; (2) he was either excluded from participation in or

22  denied the benefits of a public entity's services, programs, or activities, or was otherwise

23  discriminated against by the public entity; and (3) such exclusion, denial of benefits, or

24

1    discrimination was by reason of his disability." *Id.* (citation and internal quotation marks

2    omitted). "A disability discrimination claim may be based on one of three theories of liability:

3    disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Id.* at 738

4    (citation and internal quotation marks omitted).

5         Here, Plaintiff has not clearly alleged what on what theory of liability he bases his ADA

6    claim, and Defendants do not meaningfully address the issue. As noted, Plaintiff alleges that

7    Defendant Nikula's conduct was discriminatory because he "could not perform this particular job

8    [but] was open to other work positions." *See* Dkt. 5 at 7. Plaintiff also alleges that Defendant

9    Klemme failed to respond to his letter complaining about his medical conditions and asking

10   Defendant Klemme for lower back shots and medical items. *See id.* at 11. These allegations

11   indicate that Plaintiff bases his ADA claim on the theory that these Defendants failed to

12   reasonably accommodate his disability. *See Payan*, 11 F.4th at 738 ("A plaintiff need not allege

13   either disparate treatment or disparate impact in order to state a reasonable accommodation

14   claim." (citation omitted)).

15        "[P]ublic entities [must] make reasonable modifications in policies, practices, or

16   procedures when the modifications are necessary to avoid discrimination on the basis of

17   disability, unless the public entity can demonstrate that making the modifications would

18   fundamentally alter the nature of the service, program, or activity." *Id.* (citation and internal

19   quotation marks omitted). "[T]he plaintiff bears the burden of establishing the elements of the

20   prima facie case, including—if needed—the existence of a reasonable accommodation that

21   would enable him to participate in the program, service, or activity at issue." *Pierce v. Cty. of

22   Orange*, 526 F.3d 1190, 1217 (9th Cir. 2008) (citation and internal quotation marks omitted).

23

24

1  "[D]etermining whether a modification or accommodation is reasonable always requires a fact-

2  specific, context-specific inquiry." *Id.* (citation omitted).

3        Here, no reasonable juror could conclude that DOC officials failed to reasonably

4  accommodate Plaintiff's medical conditions. To reiterate, the evidence shows that Plaintiff

5  submitted the HSR because he did not want to work in the kitchen. Dkt. 60-7 ¶ 7; Dkt. 61-1 at 2.

6  True, the evidence supports a reasonable inference that Plaintiff later told nondefendant Conrad

7  "he was willing to work, but wanted a janitorial or other job where he could move around." Dkt.

8  61-1 at 2. However, the HSR limited Plaintiff's standing to 15 minutes and Dr. Herrington

9  extended it shortly before Plaintiff's job was dropped for medical reasons. *See id.* at 9–12; Dkt. 5

10  at 32. So it is unreasonable to infer that, when Plaintiff told Conrad he wanted to work another

11  job, he could have performed it; working as a janitor presumably would have required Plaintiff to

12  stand for more than 15 minutes. The evidence also suggests that, approximately one year later,

13  Plaintiff worked as a janitor for 246 hours. *See* Dkt. 60-1 at 13. No evidence indicates that

14  Plaintiff's HSR was active at that time. These observations further undercut the idea that DOC

15  officials failed to accommodate Plaintiff's disability by considering alternative jobs. Indeed, in

16  his prayer for relief, Plaintiff does not seek accommodative employment. *See* Dkt. 5 at 17.

17        Plaintiff also alleges, in essence, that Defendant Klemme and other DOC officials failed

18  to grant him a reasonable accommodation by denying his request for a knee brace, medical

19  mattresses, and wedge pillows. Dkt. 5 at 65. This fact does not create a genuine issue for trial.

20  "The ADA prohibits discrimination because of disability, not inadequate treatment for

21  disability." *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010) (citation

22  omitted), *overruled on other grounds as stated in Horton v. City of Santa Maria*, 915 F.3d 592,

23  599–600 (9th Cir. 2019). Properly understood, this aspect of Plaintiff's ADA claim alleges

24

1  inadequate medical treatment, which does not constitute discrimination under the ADA. *See*

2  *O'Guinn v. Nevada Dep't of Corr.*, 468 F. App'x 651, 653 (9th Cir. 2012).

3       In sum, no reasonable juror could conclude that Defendants discriminated against

4  Plaintiff by reason of his chronic lower back, hip, and knee conditions. Accordingly, Defendants

5  are entitled to judgment as a matter of law on this claim.

6       E.    Due Process

7       Plaintiff essentially alleges that the Defendants who responded to his grievances violated

8  due process because they denied them and/or failed to properly process them. *See* Dkt. 5 at 10–

9  11. However, prisoners do not have a due process right to a "specific prison grievance

10  procedure." *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (citation omitted). And, as

11  discussed earlier, the evidence compels the conclusion that Plaintiff's grievances were processed

12  properly. *See, e.g.*, Dkt. 5 at 55; Dkt. 61 ¶ 9; Dkt. 61-1 at 42. This claim presents no triable

13  issues.

14       F.    Ninth Amendment

15       Plaintiff bases his Ninth Amendment claim on "all other [alleged] constitutional

16  violations in this civil litigation." *See* Dkt. 5 at 14. However, as shown above, his other § 1983

17  claims present no genuine issues for trial. Furthermore, "the ninth amendment has never been

18  recognized as independently securing any constitutional right, for purposes of pursuing a civil

19  rights claim." *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986) (citations

20  omitted). So Defendants are entitled to judgment as a matter of law on this claim.

21       G.    State Law Claims

22       Plaintiff alleges several state law violations. *See* Dkt. 5 at 7–11. He bases them on the

23  same allegations on which he bases his § 1983 claims. *See id.*

24

1    Because Plaintiff's state law claims have a "common nucleus of operative fact with the

2    federal claims and the state and federal claims would normally be tried together," the Court has

3    supplemental jurisdiction over the state-law claims. *See Bahrampour v. Lampert*, 356 F.3d 969,

4    978 (9th Cir. 2004) (citation and internal quotation marks omitted).

5    However, the Court has discretion to dismiss the supplemental state law claims. *Acri v.*

6    *Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997). "[I]n the usual case in which all

7    federal-law claims are eliminated before trial, the balance of factors to be considered under the

8    pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point

9    toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon*

10   *Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also United Mine Workers of Am. v. Gibbs*,

11   383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even

12   though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.");

13   *Trustees of Constr. Indus. & Laborers Health & Welfare Tr. v. Desert Valley Landscape &*

14   *Maint., Inc.*, 333 F.3d 923, 926 (9th Cir. 2003) ("[O]ur cases upholding the exercise of discretion

15   under [28 U.S.C.] § 1367(c)(3) have all involved dismissals for failure to state a claim or a grant

16   of summary judgment to the defendant on the federal claim." (citations omitted)).

17   Here, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law

18   claims. The Court has dismissed all of Plaintiff's § 1983 claims and recognizes the policy of

19   avoiding "[n]eedless decisions of state law." *See Gibbs*, 383 U.S. at 726. Furthermore, declining

20   to exercise supplemental jurisdiction over the state law claims promotes judicial economy and

21   fairness because the Parties did not meaningfully address these claims in their briefs. *See* Dkts.

22   57, 69. In these circumstances, the interests in comity, judicial economy, and fairness strongly

23

24

outweigh any potential inconvenience the Parties may experience if the Court dismisses the state law claims without prejudice.

### V.      Conclusion

As discussed above, it is recommended that Defendants' motion for summary judgment (Dkt. 57) be **GRANTED**, with the result that the Court should **grant summary judgment** for Defendants on Plaintiff's federal claims and **dismiss without prejudice** Plaintiff's state law claims.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the Parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **December 3, 2021** as noted in the caption.

Dated this 17th day of November, 2021.


David W. Christel
United States Magistrate Judge